IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

                    Plaintiff          CR 05-57

          vs.                          Magistrate
                                       ~~Criminal Action~~ No. 05-56

MICHAEL MURDOCH

                    Defendant

PROCEEDINGS

        Transcript of Detention Hearing commencing on
Tuesday, February 15, 2005, United States District Court,
Pittsburgh, Pennsylvania, before Honorable Lisa Pupo Lenihan,
U.S. Magistrate Judge.

APPEARANCES:

For the Government:          US Attorney's Office
                            By:  TINA O. MILLER, Esq.
                            400 USPO & Courthouse
                            Pittsburgh, Pennsylvania 15219

For the Defendant:          JOHN A. KNORR, Esq.
                            Penthouse Suite
                            One Bigelow Square
                            Pittsburgh, Pennsylvania 15219

                            Reported by:
                            Virginia S. Pease
                            Official Court Reporter
                            1031 USPO & Courthouse
                            Pittsburgh, Pennsylvania 15219
                            (412) 471-0110

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

P R O C E E D I N G S

(Court convened at 10:10 a.m.)

THE COURT:  Please be seated.  Morning.

MRS. MILLER:  Morning, Your Honor.

THE COURT:  We're scheduled for a preliminary examination and a detention hearing in the case of United States of America versus Michael Murdoch, which is at Magistrate No 05-56.

Miss Tina Miller is representing the government, and Mr. John Knorr is representing the defendant.

Have you explained to your client the purpose of the preliminary examine, Mr. Knorr, or would you like me to do it.

MR. KNORR:  I have explained, Your Honor.  My client pleads not guilty and waives the reading of the complaint.

THE COURT:  We're not doing an arraignment right now.  We have to do a preliminary examination first.

Are you going to waive the preliminary examination?

MR. KNORR:  No, Your Honor.

THE COURT:  You want us to proceed on that?

MR. KNORR:  Yes, Your Honor.

THE COURT:  We also have a motion for detention.  You want to put on both at once, that's fine.

You ready to proceed.

1          MRS. MILLER:  I am, Your Honor.  The government

2    would call Special Agent Mike Soohy.

3          MICHAEL BANAS, Deputy Clerk:  Please state and

4    spell your name for the record.

5          THE WITNESS:  Michael J. Soohy.  Last name --

6    S-O-O-H-Y.

7          Deputy Clerk:  Please take the stand.

8                    *  *  *  *  *

9    MICHAEL J. SOOHY, having first been duly sworn,

10   testified as follows:

11                   DIRECT EXAMINATION

12   BY MRS. MILLER:

13   Q    Mr. Soohy, how are you employed?

14   A    I'm a Special Agent with the Federal Bureau of

15   Investigation.

16   Q    How long have you been employed as a Special Agent with

17   the FIB?

18   A    Just slightly less than 19 years.

19   Q    Are you familiar with the criminal complaint that was

20   filed against Mr. Michael Murdoch?

21   A    Yes, I am.

22   Q    And did you have occasion to interview Mr. Murdoch

23   following his arrest?

24   A    Yes, I did.

25   Q    Is he in the courtroom today?

1  A    Yes.

2  Q    Can you identify him, please.

3  A    He's the gentleman with the blue shirt, sitting next to

4  defense counsel.

5  Q    Okay.  Could you tell the Court how we became aware of

6  this case?

7  A    A family of a 14-year-old boy contacted the Beaver

8  County District Attorney's Office to inform them that their

9  son was having Internet and telephone conversations with

10  several individuals, many of them whom they believed were

11  adult males, and that the family also believed that their son

12  was also engaging in sexual activity with some of these

13  males.

14  Q    And that child's date of birth is January, 1990; is that

15  correct?

16  A    That's correct.

17  Q    With this information, was the child's computer seized?

18  A    Yes, it was.

19  Q    And were numerous chats recovered between the child and

20  various adult men?

21  A    Yes.

22  Q    Was the child interviewed?

23  A    Yes.

24  Q    And what did he indicate during his interview concerning

25  his activity with an individual named Mike?

1    A    The, the victim child said that he had had several

2    on-line conversations with an individual who he knew as Mike

3    from Moon Township. Described Mike as around 25 years of

4    age. He gave a screen name of Mikey -- mikey21boi, which

5    Mike used to converse with him on AOL.

6            He said that he had met Mike in person on several

7    occasions -- two occasions, wherein Mike drove to the

8    victim's town where he lived and picked him up.

9            On the first occasion, they were in Mike's car.

10   The victim said that Mike attempted to fondle him and the

11   victim kind of played that down.

12           On the second occasion some time later, several

13   months later, Mike again picked up the victim near his

14   residence, and Mike and the victim drove to Mike's apartment

15   in Crescent Township, Pennsylvania. While at the apartment

16   the victim said that Mike performed oral and anal sex on the

17   victim. And then the victim was returned to his town where

18   he lived.

19   Q    Did the child provide a telephone number for Mike?

20   A    Yes.

21   Q    And was that ultimately traced to Michael Murdoch?

22   A    Yes, it was.

23   Q    Was the victim shown a photographic line-up that

24   included the photograph of Mr. Murdoch?

25   A    Yes.

1  Q    And did the child identify Mr. Murdoch as the person

2  whom he knew as Mike and mikey21boi?

3  A    Yes, he did.

4  Q    If you could take a look at Exhibit 1 to the complaint.

5  Was this a chat that was recovered from the child's computer?

6  A    Yes.

7  Q    Okay.  And this is a chat between the child under his

8  screen name and mikey21boi; is that right?

9  A    Yes, it is.

10        MRS. MILLER:  Your Honor, I would move for the

11 admission of Government Exhibit 1.

12        THE COURT:  Any objection?

13        MR. KNORR:  No objection.

14        THE COURT:  It's admitted?

15        MRS. MILLER:  I've talked briefly with Mr. Knorr,

16 Your Honor.  Rather than go into the specifics of everything

17 that is said in this chat, I would prefer, if we can, to move

18 on, unless the Court wants it read.

19        THE COURT:  I don't think it's necessary.

20        MRS. MILLER:  Okay.

21        THE COURT:  Thank you.

22 Q    The chat that is attached to Government Exhibit 1 is

23 from July 22nd, 2004; is that correct?

24 A    That's correct.

25 Q    I'm going to show you what I am marking as Government

1  Exhibit 2, and it's a collective exhibit of chats. If you

2  could identify them for the record.

3  A    I'll go in date order. There's a chat on August 5th,

4  '04 between mikey21boi and the victim. There is a chat on

5  September 10th, 04, again between the same two parties. And

6  another chat on September 16th, '04, again between the same

7  two parties.

8  Q    Okay. And these were recovered from the child victim's

9  computer; is that right?

10  A    Yes. Yes, they were.

11            MRS. MILLER: Your Honor, I'd move for the

12  admission of Government Exhibit 2.

13            THE COURT: Mr. Knorr?

14            MR. KNORR: No objection.

15            THE COURT: And they are admitted.

16  Q    During -- if you could just take a look at the August

17  5th, '04 chat. Does mikey21boi provide a phone number for

18  himself in this chat?

19  A    He -- yes, he does. That number -- yes, he does.

20  Q    And does that match the phone number that was given by

21  the child victim for Mike?

22  A    Yes.

23  Q    Okay. And that matches the subscriber information for

24  Mr. Murdoch?

25  A    That's correct.

1    Q    Okay.  And in Page 2 of that chat, about halfway down,

2    without getting into the specifics of what it says --

3             MRS. MILLER:  And, Your Honor, I have an extra

4    copy.

5             THE COURT:  Thank you.

6    Q    Mikey21boi refers to wanting to see certain body parts

7    of the child victim again; is that right?

8    A    That's correct.

9    Q    You indicated that the child victim and Mr. Murdoch were

10   chatting on AOL.  That's America on Line; is that right?

11   A    That's America on Line; that's right.

12   Q    Are you aware where their server's are located for their

13   computer customers?

14   A    Yes.  They are in Northern Virginia.

15   Q    One of -- was AOL subpoenaed to gain certain information

16   concerning mikey21boi?

17   A    Yes, they were.

18   Q    And were there alternative screen names that were

19   provided by AOL for mikey21boi?

20   A    Yes, there were.

21   Q    Was one of thumbysucuddlyboy@hotmail.com?

22   A    Yes, it was.

23   Q    And is it true that we believe that Mr. Murdoch attended

24   Youngstown State University at some point?

25   A    Mr. Murdoch told me he attended Youngstown State

1    University.

2    Q    Okay.  The address that Mr. Murdoch provided to Pretrial

3    Services, which is 264 Spring Run Road, Apartment No. 4, is

4    that the apartment where he took the child victim to have a

5    sexual encounter?

6    A    Yes, it is.

7    Q    And did the child take police officers to this address

8    and identify the apartment?

9    A    Yes, he did.

10   Q    Mr. Murdoch's date of birth is in December of 1981; is

11   that correct?

12   A    Let me double-check here.  Yes, December, 1981.

13   Q    Now, you indicated earlier in your testimony,

14   Special Agent Soohy, that you were involved in the arrest of

15   Mr. Murdoch, and you referenced a statement that was given by

16   him.

17            Did he give you a statement following his arrest?

18   A    Yes, he did.

19   Q    And was he provided with his Miranda rights, and did he

20   agree to waive them?

21   A    Yes.  I read him his Miranda rights, went over each one

22   individually after it was read.  Presented him with a form.

23   Made sure he understood his rights, acknowledged that he did,

24   and he signed the waiver.

25   Q    Could you identify Government Exhibit 3 for the record?

1    A    This is government form FD395 entitled, Advice of

2    Rights, signed by Mr. Murdoch, written by myself and Agent

3    Edward Moschella.  Advice of rights read to him at 8:58 a.m.

4    on the 11th of February, and signed by him at 9:01 a.m.

5         MRS. MILLER:  Your Honor, I'd move for the

6    admission of Government Exhibit 3.

7         MR. KNORR:  No objection.

8         THE COURT:  It's admitted.

9    Q    Did you prepare a report following your interview of

10   Mr. Murdoch?

11   A    Yes, I did.

12   Q    Okay.  Could you tell me what Mr. Murdoch told you

13   during the interview?

14   A    Um, Mr. Murdoch told me that he had, in fact, had

15   several on-line conversations and several telephone

16   conversations with an individual whom he knew to be under the

17   age of 18, and that he eventually met this individual on two

18   occasions.  Both times he picked up the individual near the

19   person's residence in a local Beaver County town.

20        Mr. Murdoch said that the first time he and the

21   individual -- I'll call him the victim -- sat in

22   Mr. Murdoch's car, and that during this first meeting they

23   showed each other their penises.  Mr. Murdoch denied that

24   there was any type of contact during this first meeting.

25        He said that after the first meeting they

1   maintained communication both on the Internet and through

2   cellphone conversations, because Mr. Murdoch had given the

3   victim his cellphone number.

4          Several months later they arranged for a second

5   meeting.  Again, Mr. Murdoch picked up the victim near his

6   Beaver County town, near his home.  Mr. Murdoch said that he

7   then drove the victim to Crescent Township, Pennsylvania

8   where Mr. Murdoch maintained an apartment.  He and the victim

9   went into the apartment, began watching TV on the couch, and

10  at that point Mr. Murdoch said that he and the victim

11  masturbated each other.  Mr. Murdoch said that he completed

12  to ejaculation but the victim did not.  Mr. Murdoch said he

13  does not remember any other activity occurring in the

14  apartment.

15         Short time later he drove the victim back to near

16  his residence where he picked him up, and that he has had no

17  contact.  The victim called him; had a couple other on-line

18  chats subsequent to that second meeting, but they did not

19  meet in person again.

20  Q    Did Mr. Murdoch indicate that he had ever had a sexual

21  encounter with any other minors?

22  A    Yes, he did.

23  Q    Can you tell us what he said?

24  A    Mr. Murdoch told me that while he was in Florida in

25  December of 2003 he was engaged in a, what he called an orgy

1    with two other adults and two other children that he knew to

2    be minors.

3    Q    And have we obtained information during the course of

4    the investigation indicating that Mr. Murdoch may have had a

5    sexual encounter with a 12-year-old boy?

6    A    Yes. An individual who was familiar with Mr. Murdoch

7    has told us that Mr. Murdoch told him that he has had sex

8    with a 12-year-old boy.

9            MRS. MILLER:  Nothing further, Your Honor.

10           THE COURT:  Cross examine.

11                      CROSS EXAMINATION

12   BY MR. KNORR:

13   Q    Can you identify that person?

14           MRS. MILLER:  Your Honor, I'm going to object to

15   identifying any sources at this point.

16   Q    This individual that you've said told you --

17   A    Told us.

18   Q    -- that my client had told him that he had sex with a

19   12-year-old boy, can you identify that person?

20           THE COURT:  There's an objection.

21           MR. KNORR:  I'm trying to clarify, Your Honor.

22           THE COURT:  You just want "yes" or "no," can you

23   identify, but not the name?

24   Q    You can identify that person?

25   A    We have a name for that person, yes.

1  Q   Okay.  Can you tell me whether that person was a part of

2  what was described as an orgy?

3  A   Can I --

4          MRS. MILLER:  Your Honor, I'm going to object,

5  because I think that what Mr. Knorr is trying to get at is

6  the identity of the source, and I think that under Roviero

7  we're entitled to keep confidential sources, at least at this

8  point in the case, confidential.

9          THE COURT:  Yes.  I'm inclined to agree with that,

10 Mr. Knorr.

11         MR. KNORR:  Your Honor, it would be my position,

12 I'm not seeking the identity of the source, but the

13 reliability of the information from which he has -- the point

14 of view from which he is able to state that.

15         THE COURT:  Um hum.  And I would say that that's

16 not -- if I find probable cause, which at this point I'm

17 inclined to find, it's not based upon that particular

18 statement at all, because it's hearsay on hearsay.

19         MR. KNORR:  Right.

20         THE COURT:  So for purposes of the preliminary

21 examine, I'm going to sustain the government's objection.

22 But I'm sure at some later point you'll have to either reveal

23 that information or give him something, if you're going to

24 pursue that.

25         MRS. MILLER:  Absolutely, Your Honor.  I mean, my

1    concern at this point is I don't know whether Mr. Murdoch is

2    going to be detained, and I don't want to identify witnesses

3    who he could possibly retaliate against.

4              THE COURT:  Which is understandable.

5              So I'm going to sustain the objection at this time.

6              MR. KNORR:  Thank you.  Thank you, Your Honor.

7    Q    Special Agent Soohy, the information that you've

8    provided, is that information that you gained in the course

9    of your investigation, or is it part of information that was

10   gained by other agents?

11   A    Part of each.  The information I provided regarding the

12   interview of Mr. Murdoch I was personally involved in.

13   Q    Okay.

14   A    The other information is, was investigation done by

15   another FBI agent.

16   Q    Okay.  In the course of your investigation, did you

17   determine whether at any point the alleged victim had

18   represented himself to be over the age of 18?

19   A    Do I personally know, have any information to that

20   effect?  No, I don't.

21   Q    Right.  Does the file that you gathered indicate that

22   that representation was made?

23   A    The only thing I have had to review were the documents

24   that were -- the criminal complaint, my interview and the AOL

25   on-line information.

1   Q    Okay.

2   A    And --

3   Q    With respect to the AOL on-line information, that was

4   information that was seized from the victim's computer;

5   correct?

6   A    That's correct.

7   Q    Do you know whether the victim had posted a personal

8   profile on his computer?

9   A    I believe the victim did post a personal profile.

10  However, I have not seen it.

11  Q    Okay.  Do you happen to know, have you examined the chat

12  room and the conditions of the chat room that these

13  communications took place in?

14  A    I don't understand the question.

15  Q    Do you happen to know whether there's an over 21 and an

16  under 21 section of that chat room?

17  A    Personally, I do not know.

18  Q    Would you agree that, albeit the fact that this was a

19  14 year old, there's no allegation that the conduct was any

20  other than consensual; right?

21           MRS. MILLER:  Your Honor, I guess I would object to

22  the use of the word "consensual."  I mean, we will stipulate

23  there's no force or fear that we are alleging in this case,

24  but I think consent is kind of a magic word that may have

25  more legal --

1          THE COURT:  Legal terminology.

2          MR. KNORR:  Which is why I said, albeit the child

3    was 14, but you've consented -- or agreed it's not violent.

4          MRS. MILLER:  There's no force here.

5    Q    Could you tell me where the interrogation of my client

6    took place?

7    A    The interview occurred at the FBI Office in Cranberry

8    Township, Pennsylvania.

9    Q    Where was he placed under arrest?

10   A    At Crescent Township, at his residence.

11   Q    At what time?

12   A    Around 8:15 a.m. or so.

13   Q    Did you wake him up?

14   A    Yes.  Yes, sir, we did.

15   Q    And what time did the interrogation begin?

16   A    The interview began about 8:58 a.m.

17   Q    And concluded at what time?

18   A    Approximately 9:42 a.m.

19   Q    In the course of your investigation, did you determine

20   that at some point the victim told my client that he was

21   17 years of age?

22   A    Can you restate the question, please?

23   Q    In the course of your investigation, did you determine

24   that the victim had told my client that he was 17 years of

25   age?

1  A     Mr. Murdoch told me that as they were driving to his

2  apartment in Crescent Township, he recalled the victim

3  telling him he was 17 years old.

4  Q     Did the victim advise you what age he had told the

5  defendant he was?

6  A     I have never spoken to the victim.

7  Q     Based on your testimony, under my client's statement

8  there were two meetings; is that correct?

9  A     That's correct.

10  Q     Do you know the dates on which those meetings are

11  alleged to have occurred?

12  A     I don't know the dates.  Mr. Murdoch believed one was in

13  early summer, one was in late summer.

14           MR. KNORR:  That's all I have, Your Honor.

15           THE COURT:  Any additional?

16           MRS. MILLER:  Just one question.

17                     REDIRECT EXAMINATION

18  BY MRS. MILLER:

19  Q     Have you seen --

20           MRS. MILLER:  I guess maybe two.

21           THE COURT:  Okay.

22  Q     Have you seen a picture of the child victim?

23  A     Yes, I have.

24  Q     Does he -- can you characterize how he looks?

25  A     He looks to me to be very young.  I have an 18-year-old

1  son, and there's no way that the victim, to me, looks

2  anywhere near the age of 16 even.

3  　　　　MRS. MILLER:  Nothing further.

4  　　　　MR. KNORR:  Nothing further.

5  　　　　THE COURT:  Thank you, Agent Soohy.  You're

6  excused.

7  　　　　Do you have anything else, Miss Miller?

8  　　　　MRS. MILLER:  No, Your Honor.

9  　　　　THE COURT:  Okay.

10 　　　　MR. KNORR:  No argument on the preliminary

11 examination.

12 　　　　THE COURT:  All right.

13 　　　　I do find that probable cause does exist, that a

14 crime has occurred, and that Mr. Murdoch is the person who

15 committed the crime, and I'll enter an appropriate order.

16 　　　　Which leaves with us the motion for detention.

17 　　　　Do you have anything additional to add on the

18 motion for detention, besides Agent Soohy's testimony?

19 　　　　MRS. MILLER:  No, Your Honor.  I would just note

20 that under 3142, because there has been a probable cause

21 finding that Mr. Murdoch -- or excuse me, on the coercion and

22 enticement, that Mr. Murdoch, there's probable cause to

23 believe that he committed that offense, that 3142(e) does

24 create a presumption in favor of detention, which of course

25 is rebuttable by the defendant.

1    So we would rely not only on the agent's testimony,

2    but on the presumption in arguing that Mr. Murdoch should be

3    detained.

4        I don't know if you want to hear a full argument on

5    that at this point, or wait until the defendant has had an

6    opportunity.

7        THE COURT:  We can wait.

8        Mr. Knorr, do you have any testimony on detention?

9        MR. KNORR:  I have no testimony, Your Honor, other

10   than to confirm the availability of my client's father, who's

11   in the courtroom, if the Court were to determine that one of

12   the conditions that would guarantee his appearance would be

13   to be placed in the custody of a third party.

14       And I would also indicate that his mother is also

15   available for that purpose, as indicated in the presentence,

16   or in the Pretrial Services report.  His mother is not able

17   to be in Court this morning because of the death of her

18   mother, and she does have an illness, but she would be

19   available as well to act as a third party custodian.

20       THE COURT:  Okay.  Under the law there is a

21   presumption in favor of detention, unless I find that there

22   is a condition or combinations of conditions that would

23   reasonably assure Mr. Murdoch's appearance, and more

24   importantly, the safety of any other person in the community.

25       So, I mean, obviously, they have the presumption,

1    and I found probable cause.  I'm looking now to whether there

2    are conditions that can exist, that do exist that could

3    assure the safety of people in the community.

4         So in that light, if Mr. Murdoch's father is

5    willing to testify, that would be relevant to me.

6         MR. KNORR:  Yes, Your Honor.

7         Mr. Murdoch, would you please approach.

8         MICHAEL BANAS, Deputy Clerk:  Sir, would you please

9    state and spell your name for the record.

10        THE WITNESS:  Michael G. Murdoch -- M-U-R-D-O-C-H.

11        MICHAEL BANAS, Deputy Clerk:  Please take the

12   stand.

13                    *  *  *  *  *

14        MICHAEL G. MURDOCH, having first been duly sworn,

15   testified as follows:

16                    DIRECT EXAMINATION

17   BY MR. KNORR:

18   Q    Would you please state your name, sir.

19   A    Michael G., as in Gerald, Murdoch.

20   Q    And where do you reside?

21   A    98 Figley Avenue, Aliquippa, Pennsylvania.

22   Q    How long have you resided there?

23   A    Since November.

24   Q    And what is your marital status?

25   A    Separated; filed for divorce.

1  Q    And you are the father of the defendant, Michael

2  Murdoch; is that correct?

3  A    Correct.

4  Q    How are you employed, sir?

5  A    I'm a vocational instructor at Beaver County Area

6  Vo-Tech.

7  Q    And how long have you been in that capacity?

8  A    This is my fourth year.

9  Q    Would you, if the Court were to determine to impose a

10  condition for your son's release, would you be willing to act

11  as his third party caretaker in this regard?

12  A    Yes, I would.

13  Q    If the Court were to impose conditions on his release

14  that would include meeting with the physician or a

15  psychiatrist to follow up on some mental health treatment he

16  was getting, would you see he complied with those conditions?

17  A    I definitely would.

18  Q    You have you ever been charged with a crime.

19  A    No.  Other than DUI.

20  Q    And how long ago was that?

21  A    About ten years ago.

22  Q    You're not on probation or parole at this time; are you?

23  A    No.  No, sir.

24  Q    You're familiar with the fact your son was receiving

25  some mental health counseling prior to his arrest?

1    A    Yes, he was.

2    Q    And would you help facilitate that treatment?

3    A    I would be glad to.

4    Q    Would you see that he maintained his obligations with

5    respect to reporting to Pretrial Services?

6    A    Definitely.

7    Q    Would you assure that he have no contact with any

8    individual under the age of 18?

9    A    I would do my absolute best.

10   Q    Would you see that he -- do you have a computer in your

11   home?

12   A    Yes, I do.  I use it for my college work and homework.

13   Q    Okay.  Is there a way for you to safeguard that so your

14   son would not have access to it?

15   A    If I can't knock it down, I'll take it out of there.

16   Q    Physically remove it?

17   A    If I have to.

18            MR. KNORR:  Does the Court have any questions?

19            THE COURT:  You work full-time, sir.

20            THE WITNESS:  Yes, ma'am.

21            THE COURT:  Like what are your hours?

22            THE WITNESS:  Daily from 7:30 to 3:30.

23            THE COURT:  Um hum.  What do you mean when you say,

24   "knock it down," regarding the computer?

25            THE WITNESS:  If I couldn't put a fire wall in it

1    or threw a password on that he couldn't get around it, or

2    lock it up -- I am taking college courses and I use it at

3    home for that.

4              THE COURT:  Um hum.  Is there anyone else that

5    lives with you.

6              THE WITNESS:  Yes.

7              THE COURT:  who else lives with you?

8              THE WITNESS:  My girlfriend.

9              THE COURT:  Is she working or at home?

10             THE WITNESS:  She's also an instructor, too.

11             THE COURT:  Okay.

12             Cross examine, Miss Miller.

13                     CROSS EXAMINATION

14   BY MRS. MILLER:

15   Q    Do you live in a neighborhood?

16   A    Yes, ma'am.

17   Q    Sir, do you live in an apartment or a house?

18   A    A house.

19   Q    Okay.  Any children as neighbors?

20   A    Um, not close anywhere.

21   Q    What's the closest?

22   A    Um, we just moved in in November.  We have kind of an

23   isolated acre of property that's in a neighborhood, but it

24   sits by itself.  I would have to say couple blocks away.

25   Q    Any teenagers in the neighborhood?

1    A    I have a 14-year-old girl that lives with us; my

2    girlfriend's daughter.

3    Q    Your girlfriend's daughter; okay.

4         Where's the nearest school?

5    A    It would be Center Township School District.

6    Q    How far is that?

7    A    Approximately three miles.

8    Q    Okay.  So, with respect to the computer, would you be

9    willing to completely get rid of your computer; not have any

10   access to it?

11   A    Um, if I have to, yes.

12   Q    You said you'd "lock it up."  What did you mean by that?

13   A    That it couldn't be accessed by anyone other than myself

14   with a password.  So -- it's in my bedroom, so there would be

15   no access to it.

16   Q    The Pretrial Services report, sir, indicates that your

17   son has had some ongoing mental health problems.

18   A    We've had him evaluated and wanted him to stay in

19   counseling and on medication, and this is something we would

20   definitely stay on top of now.

21   Q    Has he been noncompliant with his medication?

22   A    I don't think noncompliant, as much as when he was out

23   of work and out of coverage, he didn't get his medication

24   refilled and stopped taking it.

25   Q    Was he working up until the time he was arrested?

1    A    Yes.

2    Q    Where was he working?

3    A    King's Restaurant.

4    Q    How long had he worked there?

5    A    Um, not long.  He was working there and at West Hills

6    Motors before then.

7    Q    Okay.  And how long did he work at West Hills Motors?

8    A    Um, maybe two months.

9    Q    Okay.  And before that, where did he work?

10   A    Greater Pittsburgh Collision.

11   Q    How long did he work there?

12   A    Ah, eight, nine months.

13   Q    How much contact have you had with him over the last

14   year?

15   A    Well, my wife and I went through separation last year,

16   and my son's spent a good bit of time with her, as they are a

17   little bit closer.  And just recently, in the last couple

18   months, my son and I grew closer, and we're forming a better

19   relationship.

20   Q    Prior to the last couple months, how much, on average,

21   would you see Michael?

22   A    At least once a month.

23   Q    Once a month, okay.

24        Do you engage in any outside activities, church, or

25   any kind of groups or anything?

1    A    Yes, yes.

2    Q    Can you tell us about that?

3    A    I belong, am now attending Beaver County Christian

4    Assembly.  It's a nondenominational Bible church that my

5    girlfriend and I are involved in.  I've been speaking with

6    Mike about getting involved seriously thought I was really

7    close to having him come with us.

8    Q    Does that include activities in the evening?

9    A    Other than Wednesday night services, that's it.

10   Q    And do you have any other outside activities that you

11   engage in?

12   A    No.  Other than what I'm involved with with the school.

13   Q    And what is that?

14   A    Skills USA, which is a youth group; competitions, social

15   events and things.

16   Q    And how frequently does that occur?

17   A    Maybe three, four times a year.

18   Q    All right.

19         MRS. MILLER:  I have nothing further Your Honor.

20         THE COURT:  Any further direct?

21                   REDIRECT EXAMINATION

22   BY MR. KNORR:

23   Q    Mr. Murdoch, with respect to Michael's mental health

24   treatment, that has been for depression; is that correct?

25   A    I, I don't know the complete evaluation, because my wife

1  was involved with that. But I believe that was part of it,

2  yes.

3  Q    Okay. Are you aware that he had signed himself into

4  Sewickley Valley Hospital, I think in November?

5  A    Yes.

6  Q    Is that correct?

7  A    Yes, sir.

8  Q    And as a result of that, he was prescribed Welbutrin, an

9  anti-depressant. Are you familiar with that?

10  A    I believe that's what it was, yes.

11  Q    Okay. Has there ever been any -- other than the normal

12  symptoms of depression, has there ever been any aberrant

13  behavior that you would relate to his mental health

14  condition?

15  A    No, nothing.

16  Q    Thank you.

17        THE COURT: Anything further?

18        MRS. MILLER: No, Your Honor.

19        THE COURT: Thank you very much, Mr. Murdoch.

20  You're excused.

21        Mr. Knorr, are you able to proffer information

22  about the mother of the defendant; you know, who she lives

23  with? Does she work, anything like that?

24        MR. KNORR: Your Honor, I am. If you give me just

25  one moment, I'll just get a little bit more detail.

1          If it please the Court, my client's mother is

2     Kristy Murdoch, Your Honor.  She lives at 905-A Pittsburgh

3     Street in Scottsdale, Pennsylvania.  She receives Social

4     Security disability income for a degenerative immune

5     deficiency disease called scleroderma.  She is not employed

6     because of that condition.

7          As I indicated earlier, her mother has just died,

8     and a combination of that and her physical condition has

9     prevented her from being here today, although normally her

10    physical condition would not impede her ability to act as a

11    caretaker, if the Court sees fit.

12              THE COURT:  She drives?

13              MR. KNORR:  She does drive, Your Honor.

14              THE COURT:  Does anyone else live in the home?

15              MR. KNORR:  No, Your Honor.  It's an apartment.

16    She lives by herself.

17              THE COURT:  Do you know if she has a computer?

18              MR. KNORR:  She does, Your Honor.

19              THE COURT:  Did you -- Mr. Martin, did you happen

20    to talk to her about her computer, whether she would be

21    willing to --

22              DENNIS MARTIN, Pretrial Services Officer:  I didn't

23    ask her about that.  When she indicated that she was unable

24    to be here, that's when we started speaking with the

25    defendant's father about him possibly living there.

1       She indicated that she would comply with any

2   conditions that the Court did impose.  We didn't get into

3   details, because I was unaware of whether or not she would

4   even be considered at this point.  But she, she did indicate

5   she would comply fully with any condition the Court imposed.

6       THE COURT:  Okay.  Thank you.

7       MR. KNORR:  She indicated that to me as well, Your

8   Honor.

9       THE COURT:  Thank you.

10      Okay.  Argument.

11      MRS. MILLER:  Your Honor, can I just briefly recall

12  Special Agent Soohy --

13      THE COURT:  Sure.

14      MRS. MILLER:  -- concerning one matter.

15                          * * * * *

16      MICHAEL J. SOOHY, having been previously duly sworn,

17  testified further as follows:

18                      REDIRECT EXAMINATION

19  BY MRS. MILLER:

20  Q   Special Agent Soohy, what computers was Mr. Murdoch

21  using when he was having conversations with the child victim,

22  according to your investigation?

23  A   Mr. Murdoch did not have a computer in his apartment.

24  He told me that.  And he also told me that he, he frequently

25  used a computer at an individual's house that he was

1    associated with, a gentleman named Dave -- I can't even

2    pronounce his last name -- that lives near Moon or Hopewell.

3          And Agent Moschella also determined that

4    Mr. Murdoch, through other interviews, used various computers

5    in the public library and other locations.

6    Q    And do you also have information he was using a computer

7    at his mother's residence?

8    A    I, I don't know, have an answer to that.

9    Q    Okay. And do you know whether we also have information

10    that he was using his father's computer to correspond on the

11    computer?

12    A    I don't -- I'm not aware of that either.

13          MRS. MILLER: Nothing further.

14          THE COURT: Any cross on that issue?

15          MR. KNORR: No, Your Honor.

16          THE COURT: Okay. Thank you, Agent Soohy.

17          THE COURT: Would you like to make argument?

18          MRS. MILLER: Yes, Your Honor.

19          I do not believe the evidence that has been offered

20    by the defendant sufficiently rebuts the presumption that we

21    have in this case.

22          And not only the presumption, but the other

23    evidence that we have concerning Mr. Murdoch's activities not

24    only with the child victim, but with other child victims.

25          That -- this isn't a case where this is activity

1  engaged in by Mr. Murdoch on only one occasion. We have at
2  least two encounters with the child victim, and we have other
3  victims out there that Mr. Murdoch himself has admitted to.

4        So, I do not believe that the evidence presented by
5  the defense sufficiently rebuts the presumption and the
6  evidence that we've presented in favor of detention.

7        You know, I -- I certainly feel for Mr. Murdoch's
8  father and appreciate his concern and his willingness to
9  accept responsibility for his son and watch over him, but
10  he's not there all day.

11       And I'm not quite clear what would happen to his
12  computer if he were given custody of Mr. Murdoch, whether he
13  would actually take it to a location where Mr. Murdoch would
14  have no access to it. But there's clearly other individuals
15  in the house who could provide access to a computer for
16  Mr. Murdoch.

17       There's a neighborhood there. Mr. Murdoch has
18  already shown that he will use other computers in libraries
19  or whatever to engage in this kind of activity.

20       So, you know, certainly I, as I said, I feel for
21  Mr. Murdoch's father. I just don't believe that the
22  conditions that he is able to impose are sufficient to
23  guarantee that the community is going to be safe.

24       And with respect to Mr. Murdoch's mother, we
25  haven't had an opportunity to see her, see how ill she may

be. I don't know how much control that she would be able to
have over her son with her illness. We don't know what the
conditions are in her apartment building; whether there are
other teenagers that live there.

So, I don't think that that is sufficient to rebut,
again, presumption and the evidence that we have in favor of
detention in this case. So, I would ask that the Court
detain Mr. Murdoch.

THE COURT: Mr. Knorr?

MR. KNORR: Your Honor, I'm not disputing the
seriousness of the specific charge that my client faces, but
I would respectfully suggest that there are conditions that
would reasonably assure my client's appearance and the safety
of the community.

And I would suggest that that's set forth in the
Pretrial Services' recommendation, including that he continue
with his mental health counseling, that he reside with one of
his parents. In this case I would suggest Mr. Murdoch is the
most likely candidate for that; that he be supervised by the
electronic monitoring program, which would confine him to his
residence except for employment, Court appearances or therapy
appointments.

I would specifically suggest to the Court that that
limitation will answer some of the concerns that the
government has raised about access to library computers or

1  neighbor computers.

2  Obviously, we would ask the Court to impose a

3  condition that he not associate with people under the age of

4  16, as recommended by the Pretrial Services.

5  And finally, that he not possess a personal

6  computer or access that computer from any location.

7  Clearly, this is the kind of thing that can be

8  monitored by the government, at least insofar as they had

9  access to his computer and his on-line accounts.

10  His father has indicated he would do everything

11  possible to assure compliance with these conditions.  And I

12  suggest that we have rebutted the presumption that has fallen

13  in favor of the government.

14  THE COURT:  Thank you.

15  I'm required, as you know, under the law to look at

16  four different issues in deciding whether detention should be

17  granted.

18  First, the nature and circumstances of the offense

19  charged.  It is a very serious offense, one which I would

20  characterize as a crime of violence against a minor.

21  Although it is not the same, in my mind, as if the defendant

22  had lured someone under false pretenses to engage in sexual

23  relations.  This is a person that did come willingly, which

24  doesn't mitigate against the seriousness, but mitigates a

25  little bit against the danger to the community.

1            The weight of the evidence is substantial and

2 definitely goes in favor of the government.

3            The history and characteristics of the accused. He

4 does have community ties, family ties. There's no past

5 criminal history.

6            I don't see any reason that he would flee, at least

7 in what has been presented at this time. He was not on

8 probation or parole at the time of this arrest.

9            And then, finally, the nature and seriousness of

10 danger to any person or to the community if he is released.

11 And that's really the key for me, is can we create a set of

12 circumstances that will reasonably protect the rest of the

13 community.

14            Like Miss Miller, I appreciate, Mr. Murdoch, your

15 being here and offering to act as third party custodian, but

16 I think that the situation there is not one that I feel

17 comfortable with. There is another minor in the home;

18 everyone works. There just wouldn't be anyone to monitor

19 Mr. Murdoch.

20            The mother may present a potential third party

21 custodian that would be acceptable, but I would have to

22 require her to take the computer out of the house. I mean, I

23 just don't see any other way to do it.

24            And another problem that we have is that she needs

25 to attest that she's willing to act as third party custodian.

1    I'm not quite sure how we do that without her being here.

2              But at this point, if she is willing to do that and

3    is willing to act as third party custodian, and if she is

4    willing to contact the Court if Mr. Murdoch violates

5    conditions of his release, I would grant -- I would deny the

6    request for detention, grant release. But I would have home

7    incarceration.

8              I don't think that his job is one that's important

9    enough to release him to go to work, and I would not allow

10   him to work.

11             Continue to attend mental health counseling. No

12   contact with any minors. No computer or Internet use, and he

13   could leave the residence for the treatment, the mental

14   health treatment, and also for Court appearances.

15             Do you have a passport, Mr. Murdoch?

16             THE DEFENDANT: No, I don't.

17             THE COURT: All right. He would not obtain a

18   passport. Avoid contact with anyone who may be a victim or

19   potential witness. Not have a firearm. Not have any

20   narcotics. And again, be on 24-hour home incarceration.

21             But what do we do about the mother? She's not

22   here, and I can't release him into her custody without her.

23             MR. KNORR: I understand, Your Honor. Would that

24   require a court appearance, or can that be facilitated

25   through Pretrial Services?

1    MRS. MILLER: Your Honor, I would object, because I

2    think that if he's offering this evidence, I have a right to

3    cross examine her. So, I would object to anything short of

4    another court hearing.

5    And I mean, I understand that she's in a terrible

6    circumstance right now, with her health and losing her

7    mother, but I think that this is just something too important

8    just to have, you know, someone call and say, yeah, I'll do

9    it, and that's the end of it.

10    I don't think that it's sufficient to rebut the

11    presumption either in favor of detention. So, I would

12    object.

13    THE COURT: Would she be able to make a court

14    appearance if we scheduled a few days up?

15    MR. KNORR: I believe so, Your Honor. Maybe the

16    day after tomorrow.

17    THE COURT: Yes. I would agree with Miss Miller,

18    and I would feel more comfortable also.

19    MR. KNORR: I'm fine with that.

20    THE COURT: She is entitled to some cross

21    examination. I would feel more comfortable hearing some

22    testimony.

23    MR. KNORR: Yes, Your Honor.

24    THE COURT: So, given that, we'll grant -- the

25    Court will grant, will temporarily grant the request for

1     detention.

2         We'll check our calendar.

3         MICHAEL BANAS, Deputy Clerk: Friday at 10:00?

4         THE COURT: Friday at 10:00?

5         MRS. MILLER: That's fine, Your Honor.

6         THE COURT: What's the date; 18th?

7         MR. KNORR: Would we do it a little bit later in

8     the morning? I'm in Beaver County. The Judge promises

9     15 minutes.

10         THE COURT: What do we have?

11         MICHAEL BANAS, Deputy Clerk: We could do it early

12     afternoon.

13         THE COURT: Maybe we could do it at 1:00.

14         MR. KNORR: 1:00 is fine. I appreciate that, Your

15     Honor.

16         THE COURT: Is that all right with you,

17     Miss Miller?

18         MRS. MILLER: That's fine.

19         THE COURT: We'll continue the hearing, the

20     detention hearing until the 18th at 1:00 p.m.

21         Mr. Murdoch will be temporarily detained until that

22     time.

23         We'll just do an order of temporary detention.

24         All right. Is there anything else? Then we're

25     adjourned and I'll do the appropriate order.

1          (Whereupon, court adjourned at 11:10 a.m.)

2                * * * * *

3                I N D E X

| GOVERNMENT WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Michael J. Soohy | | | | |
| By Mrs. Miller | 3 | | 17 | |
| | | | 29 | |
| By Mr. Knorr | | 12 | | |

| DEFENDANT WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Michael G. Murdoch | | | | |
| By Mr. Knorr | 20 | | 26 | |
| By Mrs. Miller | | 23 | | |

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Virginia S. Pease
Official Reporter